In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 24-2489 & 24-2672

UNITED STATES OF AMERICA,

*Plaintiff–Appellee/*
*Cross-Appellant*

*v.*

ASHANTAE CORRUTHERS,

*Defendant–Appellant/*
*Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Central District of Illinois.
No. 22-20066-001 — **Michael M. Mihm**, *Judge.*

———————————

ARGUED SEPTEMBER 18, 2025 — DECIDED APRIL 27, 2026

———————————

Before RIPPLE, LEE, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* On October 4, 2022, a federal grand jury charged Ashantae Corruthers with conspiracy to illegally purchase and transfer a firearm, in violation of 18 U.S.C. § 371 (Count I), and conspiracy to engage in misleading conduct, in violation of 18 U.S.C. §§ 1512(b)(3), 1512(k), and 2 (Count II). Corruthers later pled guilty to both charges and was

sentenced to an above-guidelines sentence of 48 months' imprisonment. It is this sentence that is at issue in this appeal. We find no errors by the district court, so we affirm.

## I.    BACKGROUND

### A.  Factual Background

Corruthers grew up in Kankakee, Illinois in the 1990s, where she became friends with Regina Lewis. In 2020, Corruthers was living in Indianapolis, Indiana and Lewis in Normal, Illinois. Lewis contacted Corruthers to request her assistance in purchasing a firearm for her cousin, Darrion Lafayette, in exchange for a couple hundred dollars. Corruthers agreed.

In November 2020, Lafayette and Lewis traveled from Illinois to Indiana to complete the straw purchase.[1] After retrieving Corruthers, the group traveled to Indy Trading Post/Full Throttle Arms, located at 2851 Madison Avenue in Indianapolis, Indiana to complete the firearm purchase. While Lafeyette waited in the car, Corruthers and Lewis went inside the store. Once inside, Lewis texted Lafayette to confirm which firearm he wanted. Lafayette sent three text messages in response: "Glock 48," "Get some shells too," and "Hallowtips [sic] if u can."

Corruthers, following Lafayette's directive, purchased 50 rounds of Sellier & Bellot nine-millimeter ammunition and a Glock, Model 48, nine-millimeter, semiautomatic pistol, bearing serial number ADTZ976. To complete the purchase,

---

[1] For purposes of this appeal, the term "straw purchase" refers to a transaction where one person purchases a firearm for another person. *See e.g.*, *United States v. Inglese*, 282 F.3d 528, 531–32 (7th Cir. 2002).

Corruthers filled out a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Form 4473, Firearms Transaction Record. Corruthers certified that she was the actual buyer of the firearm and that she was not purchasing the firearm on behalf of another.

Completing the transaction, Corruthers and Lewis returned to the car with Lafayette. Corruthers then gave the firearm to Lewis, who then gave the gun to Lafayette.

Three months later, on February 21, 2021, the Champaign, Illinois Police Department (CPD) responded to a call involving a domestic dispute and gunshots being fired. When CPD officers arrived, it was reported that Lafayette shot a gun into the air as two women were arguing about their relationship with him. Lafayette then fled from the scene. CPD officers recovered one cartridge casing stamped with "9x19 S&B 20."

On March 10, 2021, Lewis texted Lafayette asking for the model of the gun purchased for him by her and Corruthers. Lafayette responded and asked for Corruthers' phone number. In that same text message, Lafayette warned Lewis not to tell anyone that he had already shot the gun four times. In response to Lewis calling Lafayette's actions "dumb" because Corruthers had not yet reported the gun as stolen, Lafayette bragged about his plan to not get caught and "getting rid of it," if necessary.

Lewis texted Lafayette again on March 29, 2021, to ask for the firearm's serial number. Because he had scratched it off the gun, Lewis indicated that he would get it from the gun's box. After exchanging a few additional text messages with Lewis, Lafayette texted Corruthers asking her to purchase him another firearm. Lafayette also gave Corruthers the serial

number from the first firearm she purchased for him, which she later used to report the firearm stolen.

On April 26, 2021, Corruthers filed a false report with the Indianapolis, Indiana Metropolitan Police Department alleging her firearm had been stolen.

A few weeks later, in the early morning hours of May 19, 2021, Lafayette was involved in a possible domestic disturbance at an apartment complex in Champaign, Illinois. CPD Officers Jeff Creel and Chris Oberheim were dispatched around 3:24 a.m. to the scene. Upon arrival, the officers observed Lafayette sitting in a parked vehicle with the door open. As the officers approached him, Lafayette began firing the Glock 48 that Corruthers had purchased for him, striking Officer Creel and killing Officer Oberheim. Officer Creel managed to return fire and kill Lafayette. Officer Creel was wounded but survived.

About an hour later, between 4:38 a.m. and 5:02 a.m., Lewis called Corruthers approximately nine times. Around 5:23 a.m., Corruthers returned the call to Lewis and spoke with her for about seven minutes. Both women spoke again at approximately 8:15 a.m. for 28 minutes.

The Illinois State Police investigated the May 19, 2021, incident as a "righteous" or "police-involved" shooting. Investigators recovered several items from the scene, including a Glock, Model 48, nine-millimeter semiautomatic pistol, bearing serial number ADTZ976, and multiple cartridge casings with a "S&B 20 9x19" brand stamp.

ATF later traced the firearm back to Corruthers. On May 21, 2021, the ATF went to Corruthers' home to speak with her about the firearm. When ATF arrived, Corruthers was not

home, but her brother was able to connect her with the agents. On the call, Corruthers agreed to return to the apartment and speak with ATF.

Before arriving at the apartment, Corruthers called Lewis five times. Corruthers then returned home and provided several false statements to the ATF, including that the Glock 48 firearm was purchased for personal protection; that the firearm was stolen in March 2021; that she was unaware of why her firearm was discovered at the scene of a police-involved shooting in Champaign, Illinois; and that she did not know Lafayette.

### B. Procedural History

On October 4, 2022, a federal grand jury indicted Corruthers and Lewis, charging them with conspiracy to illegally purchase and transfer a firearm, in violation of 18 U.S.C. § 371 (Count I), and conspiracy to engage in misleading conduct, in violation of 18 U.S.C. §§ 1512(b)(3), 1512(k), and 2 (Count II). On October 13, 2022, federal agents arrested Corruthers and Lewis.

On May 16, 2023, Lewis pled guilty to the charges against her in an agreement with the government. The district court accepted Lewis' guilty plea, adjudicated Lewis guilty of the charges, and ordered her sentencing to occur on October 2, 2023. Roughly a month after Lewis' plea, on June 22, 2023, Corruthers pled "open" to conspiracy to illegally purchase and transfer a firearm and conspiracy to engage in misleading conduct. The district court accepted Corruthers' guilty plea on July 7, 2023.

Before sentencing, the United States Probation Office prepared Presentence Investigation Reports ("PSR") for Lewis

and Corruthers. In the revised PSRs, the probation officer first grouped the two counts of conviction pursuant to U.S.S.G. § 3D1.2(d). Next, the probation officer, in both revised PSR reports, calculated a base offense level of 14 and added a two-level enhancement for obstruction of justice resulting in an adjusted offense level of 16. *See* U.S.S.G. §§ 2X1.1(a), 2K2.1(a)(6), and 3C1.1. With no criminal history points and a three-level reduction for acceptance of responsibility, Corruthers' PSR calculated an advisory guideline range of 12 to 18 months' imprisonment. Even though Lewis was subject to the same charges and similar offense-level enhancements, her PSR calculated an advisory range of 18 to 24 months' imprisonment because of Lewis' criminal history. While the district court attempted to coordinate both sentencings, scheduling reasons not relevant to this appeal caused Lewis to be sentenced first.[2]

### 1. Lewis' Sentencing

On December 22, 2023, the district court held Lewis' sentencing hearing. During Lewis' sentencing, the government presented testimony from ATF Special Agent Cully Schweska, who explained that the CPD had enlisted the Illinois State Police (ISP) to investigate the May 19, 2021, shooting. Agent Schweska testified that the purpose of ISP's "officer-involved shooting" investigation was to rule out possible police corruption in the wake of racial tension in the area. The ISP investigators were also tasked with investigating

---

[2] United States District Court Chief Judge for the Central District of Illinois, Colin S. Bruce, originally presided over this case including the sentencing of Lewis and Corruthers. This case was reassigned to Judge Michael M. Mihm on March 31, 2025.

whether the firearm involved was a "drop gun."[3] Thus, according to Agent Schweska, the motivation behind this investigation in part was to determine whether Officers Oberheim and Creel's actions were justified.

Based on the testimony and Lewis' conduct, the government argued that Lewis was an accessory after the fact to Lafayette by obstructing ISP's post-shooting investigation. Thus, the government requested the district court calculate Lewis' sentence by cross-referencing a higher base offense level under the obstruction of justice guideline. *See* U.S.S.G. § 2J1.2(c). The district court denied the government's request, finding that because Lafayette was already deceased on scene, the only impact the ISP's post-shooting investigation could logically have was to determine whether Lafayette's death resulted from a "righteous shooting by an officer." Finding no murder investigation, the district court declined to apply the § 2J1.2(c) cross-reference to Lewis' sentencing guideline calculation. Instead, the court applied the offense level based on the conviction for conspiracy to illegally purchase and transfer a firearm. The district court sentenced Lewis to a term of 60 months' imprisonment on Count I and 102 months' imprisonment on Count II, to be served concurrently.

### 2.  *Corruthers' Sentencing*

On July 19, 2024, the district court held a hearing to resolve objections to Corruthers' final PSR. The government argued Corruthers' proposed guidelines range was incorrect. According to the government, when the PSR grouped

---

[3] The agent defined a "drop gun" as a firearm left behind at a crime scene by a corrupt police officer "to cover their tracks if they did something wrong." (District Court Dkt. 89, at 16).

Corruthers' convictions, pursuant to U.S.S.G. § 3D1.2(c), the base offense level applicable to the group was 30 and not 14 as outlined in the PSR. Similar to the argument presented at Lewis' sentencing, the government maintained that Corruthers' conduct obstructed the ISP's investigation into the murder of Officer Oberheim fatally killed in the line of duty. Instead of using the base offense level of 14 for conspiring to illegally purchase and transfer a firearm under U.S.S.G. § 2K2.1(a)(7), the government argued for a base offense level of 30 for obstructing a murder investigation, pursuant to the § 2J1.2(c) cross reference. Corruthers responded, arguing that the § 2J1.2(c) cross reference did not apply because the district court previously determined that ISP's post-shooting investigation was not a murder investigation. The district court overruled the government's objection "[f]or the same reasons expressed at … Lewis' sentencing."

The government also objected to the PSR's three-level decrease for Corruthers accepting responsibility. The district court agreed, finding Corruthers ineligible for the three-level decrease contemplated in §§ 3E1.1(a), (b). Because Corruthers does not challenge the district court's denial of a reduction for her acceptance of responsibility, we do not address that objection in resolving these appeals.

On August 12, 2024, the district court held a final sentencing hearing. The district court heard and received victim statements from Officer Creel, Officer Oberheim's family members, and Corruthers' mother. Corruthers also made a statement in allocution. The district court adopted the PSR and its findings, as modified. The court calculated Corruthers' total offense level at 13 and her criminal history category as I, resulting in a sentencing guidelines range of 21 to 27 months'

imprisonment. Both the government and Corruthers' counsel agreed, while preserving their objections. The government reiterated its request that the § 2J1.2(c) cross reference be applied to Corruthers and that she be sentenced to a term of 102 months' imprisonment, similar to Lewis.

The district court sentenced Corruthers to a term of 48 months' imprisonment after considering the factors enumerated in 18 U.S.C. § 3553(a). The district court acknowledged that Corruthers had no prior criminal history and was not likely to repeat the offense. It differentiated Corruthers' conduct from Lewis' conduct in that Lewis acted as the "fulcrum, the enabler, the quarterback" who set the underlying offense in motion by persuading Corruthers to buy the firearm for Lafayette. To justify its reason for deviating from the recommended sentence under the guidelines, the district court disagreed with U.S.S.G. § 2K2.1's treatment of straw purchasers and explained that "the guidelines as to straw purchasers" failed to "take into account the consequences of what could happen." It further explained that the consequences left unaccounted for by the guidelines included "violence being committed by others." And after considering the facts of this case, distinguishing Corruthers' and Lewis' culpability, balancing the § 3553(a) factors, and considering the parties' arguments, the district court found the above-guidelines sentence to be appropriate.

Corruthers appeals, and the government brings a cross-appeal.

## II. ANALYSIS

Corruthers now appeals her sentence. In a cross-appeal, the government appeals the district court's refusal to apply

the § 2J1.2(c)(1) cross-reference provision of the Sentencing Guidelines when calculating Corruthers' sentence. We address each argument in turn.

### A. Corruthers' Appeal

Corruthers argues that her above-guidelines sentence is substantively unreasonable. She contends that the district court "failed to engage in a meaningful" review of the § 3553(a) factors and that the court's policy disagreement with U.S.S.G. § 2K2.1 cannot reasonably support the upward variance.

When fashioning an appropriate sentence, the district court "begins with a consideration of the [advisory] guidelines" as a rough approximation of the appropriate sentence and then ends with a consideration of the factors outlined in 18 U.S.C. § 3553(a). *United States v. Warner*, 792 F.3d 847, 855–56 (7th Cir. 2015). Those factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for "a sentence that is sufficient, but not greater than necessary to accomplish the basic purposes of sentencing: just punishment, deterrence, incapacitation, and rehabilitation," *see Warner*, 792 F.3d at 855 (citation modified); (3) "the kinds of sentences available;" (4) "the kinds of sentence and the sentencing range" for that category of offense; (5) "any pertinent policy statement;" (6) "the need to avoid unwarranted sentence disparities among [similarly situated] defendants;" and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1)–(7). It is only after the district court weighs and balances these factors that it can "make an individualized assessment based on the facts presented." *Warner*, 792 F.3d at 855 (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).

Our review is two-fold: we first "assess *de novo* whether the court followed proper procedures," *id.*, and, if it did, we review the substantive reasonableness of that sentence for abuse of discretion, *United States v. De Leon*, 140 F.4th 920, 923 (7th Cir. 2025) (citing *Gall*, 552 U.S. at 56).

Not contesting the procedural soundness of the district court's sentencing decision, Corruthers contends on appeal that her sentence is substantively unreasonable. According to Corruthers, the district court failed to conduct a "meaningful review" of the § 3553(a) sentencing factors and provide support for its decision to sentence her above the recommended guidelines' range. She maintains the sole basis for the above-guidelines sentence given by the sentencing judge was the court's policy disagreement with U.S.S.G. § 2K2.1 and this alone was insufficient.[4]

"When reviewing above-guidelines sentences, we consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *United States v. White*, 126 F.4th 1315, 1323 (7th Cir. 2025) (internal quotation marks omitted) (quoting *United States v. Wood*, 31 F.4th 593, 600 (7th Cir. 2022). "As long as the court gives an adequate justification for its departure, it may impose a sentence above the guidelines range it deems too lenient." *Id.* (internal citations and quotation marks omitted).

---

[4] In a final argument in her brief, Corruthers seems to contend that the district court's statement of reasons contradicts the oral record. Finding this argument perfunctory and undeveloped, we deem it waived and decline to address it further. *United States v. Avila*, 106 F.4th 684, 696 n.4 (7th Cir. 2024).

Under this deferential standard, we "do not apply a presumption of unreasonableness to a sentence outside the Guidelines range," *United States v. Dickerson*, 42 F.4th 799, 806 (7th Cir. 2022) (citation modified), nor do we ask "what sentence we would impose," *De Leon*, 140 F.4th at 923 (citation modified). Instead, we're asking a narrow question: "whether the district judge imposed a sentence for logical reasons that are consistent with the factors enumerated in § 3553(a)." *United States v. Taylor*, 160 F.4th 874, 886 (7th Cir. 2025) (citations and internal quotation marks omitted). The cornerstone of our review is whether "the sentencing judge gives an adequate justification for the departure." *Wood*, 31 F.4th at 600 (citation modified); *United States v. McKinney*, 543 F.3d 911, 913–14 (7th Cir. 2008) ("We are no longer in a world where the district courts must justify each marginal month over the Guidelines; our review for reasonableness goes forward with a greater focus on the final sentence chosen and the quality of the justification for it.").

We conclude that the district court here did not abuse its discretion. Before imposing Corruthers' sentence, it considered each of the § 3553(a) factors and fashioned the above-guidelines sentence to the facts of Corruthers' case.

First, and when addressing the nature and circumstances of the offense, the district court disagreed with the policy underlying U.S.S.G. § 2K2.1 because it did not "take into account the consequences of what could happen" as a result of straw purchases. One example of the potential consequences is that straw purchases can lead to violence being committed by others. The district court also explained that it was troubled with the fact that this was not a "routine straw purchase." The district court provided the following explanation:

> In this case, I cannot ignore the manner in which this gun was provided to a violent felon, and Ms. Corruthers met Mr. Lafayette. I might not feel the same way if Ms. Lewis, the codefendant, had simply gone to Corruthers, got the gun, taken the gun back to Lafayette, and given it to him … . But in this case, Lafayette was someone who she met. She encountered. I presume there were discussions with Mr. Lafayette. They didn't just sit there silently together. It is not a routine straw purchase type of case.

The district court here explained *how* the specific context of the nature and circumstances of Corruthers' conduct supported an above-guidelines sentence in connection with the § 3553(a) factors. *See, e.g.*, *United States v. Hatch*, 909 F.3d 872, 875 (7th Cir. 2018) (per curiam) (finding the district court's explanation was sufficient when, among other things, the nature of the offense was regarded as "troubling"); *Morgan*, 987 F.3d at 633; *United States v. Stinefast*, 724 F.3d 925, 932 (7th Cir. 2013) ("An above-guidelines sentence is more likely to be reasonable if it is based on factors sufficiently particularized to the individual circumstances of the case rather than factors common to offenders with like crimes." (citation and quotations omitted)).

Second, the court observed that the society-at-large was the victim of Corruthers' straw purchase transaction, and that an above-guidelines sentence would "protect the public from further crimes of the defendant." Here, as in *United States v. Hargis*, we have found a district court's explanation that "harm to others," among other reasons, is an adequate explanation for an above-guidelines sentence for a defendant

without a record of criminal history. 747 F.3d 917, 920–21 (7th Cir. 2014); *see also United States v. Bridgewater*, 950 F.3d 928, 938 (7th Cir. 2020) (affirming above-guidelines sentence for a defendant without criminal history when it was based on the need to "deter future criminal conduct" and "protect the public"); *United States v. Kennedy-Robey*, 963 F.3d 688, 692 (7th Cir. 2020) (affirming sentence when the district court found a need to protect the public from the defendant's nonviolent offense).

Third, the court considered a chart prepared by Corruthers' counsel comparing sentences issued in straw purchaser cases by district courts across the country. In considering these cases, the district court distinguished Corruthers' case from another "officer-involved shooting" case captioned *United States v. Danzy*, No. 1:21-cr-00491-1 (N.D. Ill.). In *Danzy*, the defendant was sentenced to an above-guidelines sentence of 30 months' imprisonment after he purchased a firearm for his abuser. According to the district court, Corruthers' case was "a little worse" than *Danzy*. In the district court's view, Corruthers' case was not the typical straw buyer case, and it warranted a sentence reflecting that.

Lastly, the district court incorporated the policy reasons listed in *United States v. Davis* as further support for its deviation from the guideline sentence. *See* 795 F. App'x 970, 973 (7th Cir. 2019) (non-precedential). And the district court was free to do so. *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) ("[D]istrict judges are at liberty to reject *any* Guideline on policy grounds—though they must act reasonably when using that power."). Indeed, district courts have the discretion "to reject and vary categorically from … Guidelines based on a policy disagreement with those Guidelines." *Id.* (citing *Spears v. United States*, 555 U.S. 261, 266 (2009)). Given

the court's explanation that Corruthers was not a routine straw purchaser and the consequence of her action, we conclude the district court's decision to reject U.S.S.G. § 2K2.1 was reasonable and therefore not an abuse of discretion.

After considering the § 3553(a) factors, explaining its policy disagreement with § 2K2.1, and distinguishing Corruthers' case from the typical straw purchase and other straw purchase cases, the district court determined that an above-guidelines sentence was warranted. For this reason, we cannot say, as Corruthers now argues, that the district court failed to "meaningful[ly]" consider the guidelines. *See, e.g., United States v. Hendrix*, 74 F.4th 859, 868 (7th Cir. 2023) (finding that mere "disagreement as to how a court *weighs* the § 3553(a) factors" is insufficient). Nor is the above-guidelines sentence so far outside magnitude of the variance that we have found unreasonable or require further explanation. *Compare United States v. Wade*, 890 F.3d 629, 633 (7th Cir. 2018), *with United States v. Bradley*, 675 F.3d 1021, 1026 (7th Cir. 2012) (per curiam). We will not substitute our judgment for the district court below.

Accordingly, and finding no error in Corruthers' above-guidelines sentence of 48 months' imprisonment, we affirm.

### B.  The Government's Cross-Appeal

The government argues, in its cross-appeal, that the district court erred when it calculated Corruthers' Sentencing Guideline range. We disagree.

A district court's application of the Sentencing Guidelines is reviewed de novo and its factual findings for clear error. *United States v. Law*, 990 F.3d 1058, 1065 (7th Cir. 2021). "The clearly erroneous standard is deferential, and we will not

disturb the district court's findings unless, after examining the evidence and the reasonable inferences, 'we are left with the definite and firm conviction that a mistake has been made.'" *Taylor*, 160 F.4th at 880 (quoting *United States v. Ford*, 22 F.4th 687, 691 (7th Cir. 2022)).

In calculating the appropriate guideline, the district court is guided by U.S.S.G. § 1B1.1, which instructs a sentencing court to start with "the offense guideline section from Chapter Two (Offense Conduct)," then calculate "the base offense level" for each offense conviction using "any appropriate specific offense characteristics, cross references, and special instructions," then apply appropriate adjustments from Chapter 3, Parts A–C. U.S.S.G. § 1B1.1(a)(1)–(3). Where, as here, "there are multiple counts of conviction," the sentencing court then groups closely related offenses together and calculates the base offense level for the grouped counts by using the count with the highest offense level. U.S.S.G. §§ 1B1.1(a)(4), 3D1.2(c), 3D1.3(a). While this framework is "advisory and cannot mandate a strict decision-making sequence," a district court's "adherence to § 1B1.1 facilitates consistency in sentencing and permits appellate courts to follow the [district] court's reasoning in imposing a particular sentence." *Taylor*, 160 F.4th at 881 (quoting *United States v. Pankow*, 884 F.3d 785, 793–94 (7th Cir. 2018)).

Turning back to Corruthers, recall she pled guilty to conspiring to illegally purchase and transfer a firearm, in violation of 18 U.S.C. § 371 (Count I) and conspiring to engage in misleading conduct, in violation of 18 U.S.C. § 1512(b)(3), 1512(k), 2 (Count II). When calculating her guideline range, the district court first grouped Corruthers' multiple counts of conviction to determine her base offense level. Next, the

district court determined that Count One rendered the highest offense level and applied it for purposes of calculating Corruthers' total offense level.

The government disagreed with this calculation. Instead, it maintained that Count Two rendered the highest offense level and it maintains this argument in the cross-appeal. According to the government, the district court erred by failing to calculate Corruthers' sentence by cross-referencing the higher base offense under the obstruction of justice Guidelines. *See* U.S.S.G. § 2J1.2(c).

Generally, the sentencing guideline applicable to a violation of 18 U.S.C. § 1512, conspiring to engage in misleading conduct, is § 2J1.2, which provides for varying base offense levels depending on the offense and offender characteristics. *See* U.S.S.G. § 2J1.2(a), (b). Additionally, § 2J1.2(c) applies a cross reference to § 2X3.1 "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense … [and] the resulting offense level is greater than [the base offense level [under § 2J1.2(a),(b)]." *Id.* If applicable, the sentencing judge then turns to § 2X3.1 (Accessory After the Fact) to calculate the defendant's base offense level. *See* U.S.S.G. §§ 2J1.2(c)(1), 2X3.1.

According to the government, Corruthers obstructed ISP's post-shooting investigation of Officer Oberheim's murder, a first-degree crime, and Lafayette's murder, a second-degree crime, which triggers U.S.S.G. § 2J1.2(c). For support, the government points to the ATF agent's remarks at Lewis' sentencing when he testified that ISP was investigating two homicides on May 19, 2021. The government also cited several out-

of-circuit cases,[5] many of which involved defendants who were alleged to have committed an underlying offense that triggered § 2J1.2(c) or who knew their living co-conspirator committed an underlying offense that triggered § 2J1.2(c) at the time of the defendant's obstruction.

Looking to the base offense level for murder, as the government argues, Count Two's base offense level would have totaled 37 (six levels lower than the base offense level for first degree murder) or 32 (six levels lower than the base offense level for second degree murder) pursuant to U.S.S.G. § 2A1.1-2. Section § 2X3.1 has an upper limit, which the government finds to be applicable, that would have further reduced her base offense level to 30. By the government's calculation, a base offense level of 30 for Count Two rendered the highest offense level of Corruthers' convictions and would have made rendered a recommended guidelines range of 97 to 121 months' imprisonment. We disagree.

The district court did not err in declining to apply the § 2J1.2(c) cross reference. Recall at Lewis' sentencing, the district court disagreed with the government's argument that ISP

---

[5] *See, e.g.*, *United States v. Flemmi*, 402 F.3d 79, 83, 96–97 (1st Cir. 2005) (defendant "had reason to know that the grand jury was investigating a murder" but perjured himself to "impede [that] investigation of his brother and other members of the Bulger/Flemmi group"); *United States v. Connolly*, 341 F.3d 16, 21 (1st Cir. 2003) (defendant persuaded witness to falsely "testify that another FBI agent—and not [defendant]—had alerted him … to the pending indictment"). And the government's citation to *United States v. Arias* does not help its position because the Ninth Circuit agreed "that when there is more than one possible underlying offense, it is up to the sentencing court to determine with respect to which crimes being prosecuted the obstructive conduct occurred." 253 F.3d 453, 460 (9th Cir. 2001).

and ATF were conducting a murder investigation following the deaths of Lafayette and Officer Oberheim. Instead, the district court determined, based on the evidentiary record and witness testimony, that the focus of ISP's post-shooting investigation was ruling out police corruption in the death of Lafayette. Without facts to support an underlying murder investigation, the district court reasoned, the government's theory collapsed, and the court declined to apply the obstruction of justice cross-reference provision. We agree.

The district court did not clearly err in finding the § 2J1.2(c) cross reference was unwarranted for purposes of calculating Corruthers' sentence. The government resists this conclusion by arguing Corruthers' conduct obstructed the underlying murder investigations of Officer Oberheim and Lafayette. Taking the government's position at face value, it seems to suggest that any "investigation" is the prerequisite to § 2J1.2(c)'s application, no matter the investigation's scope. We disagree with that position.

Here, the district court made factual findings regarding the "underlying nature" and scope of ATF and ISP's post-shooting investigation. The sentencing judge concluded that the scope was not a murder investigation because the civilian-shooter did not survive. For the district court that meant the only logical explanation to describe the investigation's scope was, as the agent testified at sentencing, to determine whether Lafayette's officer-involved killing was justified. Without an evidentiary foundation to support the government's argument that ISP was conducting a murder investigation when communicating with Corruthers, the district court did not clearly err in declining to increase Corruthers' sentencing range by applying the § 2J1.2(c)'s cross reference.

Accordingly, we deny the relief requested by the government in its cross-appeal.

### III.    CONCLUSION

For these reasons, Corruthers' sentence is AFFIRMED.